Filed 4/19/16

CERTIFIED FOR PARTIAL PUBLICATION[*]

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D069229 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. FVA1200731) |
| MICHAEL CHRISTOPHER LUCERO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Bernardino, Gerard S. Brown, Judge. Affirmed and remanded with directions.

Nancy J. King, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal and Andrew S. Mestman, Deputy Attorneys General, for Plaintiff and Respondent.

---

[*] Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of parts III.A. and III.C.

I.

INTRODUCTION

A jury found Michael Christopher Lucero guilty of murder (Pen. Code, § 187, subd. (a))[1] (count 1), second degree robbery (§ 211) (count 2), and assault with a semi-automatic firearm (§ 245, subd. (a)(2)) (count 5). The jury also found true an allegation that Lucero committed the murder during the course of a robbery. In addition, with respect to counts 1, 2, and 5, the jury found true allegations that Lucero personally and intentionally discharged a firearm causing great bodily injury or death within the meaning of section 12022.53, subdivision (d) and personally and intentionally discharged a firearm within the meaning of section 12022.53, subdivision (c).[2]

On appeal, Lucero claims that the trial court erred in failing to instruct the jury on count 1 on the lesser included offenses of second degree murder, voluntary manslaughter and involuntary manslaughter, given the evidence of his voluntary intoxication presented at trial. In an unpublished portion of this opinion, we conclude that any error in failing to instruct on second degree murder was harmless and that the trial court did not err in failing to instruct the jury on voluntary manslaughter and involuntary manslaughter. Lucero also claims that the trial court erred in instructing the jury that it could not consider evidence of Lucero's voluntary intoxication in determining whether he personally and intentionally discharged a firearm causing bodily injury or death within

---

[1]     Unless otherwise specified, all subsequent statutory references are to the Penal Code.

[2]     We describe here only the offenses and sentencing allegations relevant to Lucero's claims on appeal, and provide a full procedural history in part II.B., *post*.

the meaning of section 12022.53, subdivision (d) and personally and intentionally discharged a firearm within the meaning of section 12022.53, subdivision (c). In a published portion of this opinion, we conclude that the trial court properly instructed the jury that it could not consider Lucero's voluntary intoxication for purposes of determining the truth of these firearm enhancement allegations. Finally, in an unpublished portion of this opinion, we direct the trial court to correct an error in the abstract of judgment. Accordingly, we affirm the judgment and remand the matter to the trial court to prepare a corrected abstract of judgment.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

A.    *Factual background*

   1.    *The events leading up to the robbery and killing*

Ahmed Silmi frequently kept cash deposits from his businesses in the trunk of his Mercedes. One of Silmi's friends, victim Darius Silveira, owned a barbershop in Fontana. On May 23, 2012, at approximately 6:30 p.m., Silmi went to visit Silveira at the barbershop. Silmi had a large amount of cash in the trunk of his Mercedes. Approximately thirty minutes later, Lucero, whom Silmi had known for a few weeks, arrived at the barbershop. The three men smoked methamphetamine together.

Silmi went outside the barbershop and smoked a cigarette with Lucero. While the two men were outside, Silmi received a phone call from one of his employees. Silmi and the employee discussed Silmi picking up deposits. After the phone call, Silmi told

Lucero that he had to leave to pick up some deposits. Silmi left the barbershop shortly thereafter. Lucero also left the barbershop in a separate vehicle.

At approximately 7:54 p.m., Lucero called Fontana Police Officer Buddy Porch. Lucero told Officer Porch that the driver of a Mercedes with Silmi's license plate number had something illegal on his person. Lucero described the location of the Mercedes. Officer Porch responded to the location and conducted a traffic stop of Silmi's vehicle. Silmi had $18,228 in cash and 44 cellular phones in the Mercedes. Silmi was taken into custody on an outstanding traffic warrant.

With Officer Porch's permission, Silmi contacted Silveira and asked Silveira to come to the location of the traffic stop and take possession of the cash and the phones. According to Silmi, before Silveira arrived, Lucero appeared at the scene of the traffic stop and told Silmi that he could take "what it is that I was trying to get to Silveira," to him. Silmi declined the offer, and Lucero left. Silveira then arrived, placed the cash and phones in the trunk of the car he was driving and left. Officer Porch took Silmi to jail.

Authorities released Silmi from jail the following morning at approximately 6:30 a.m. Silmi sent a text message to Silveira at approximately 6:45 a.m., requesting that Silveira pick him up from the jail.

2.      *The robbery and killing*

Meanwhile, at some point after leaving the location of the traffic stop, Lucero went back to the barbershop and visited with Silveira throughout the rest of that night and into the morning. At approximately 7:00 a.m., the following morning, Silveira agreed to give Lucero a ride to his van on his way to pick up Silmi from jail. Silveira drove Lucero to

4

his van.  As he was exiting the car, Lucero pointed a gun at Silveira and told him to open the trunk of the car.  When Silveira attempted to drive away, Lucero shot him several times.

Alejandro Cardoso was driving his car near the scene of the shooting immediately after the shooting occurred.  Cardoso saw the car that Silveira was driving crash into a house.  Moments later, he observed Lucero run to a van parked nearby and drive away.

At approximately 7:06 a.m., Officer Michael Bernholtz of the Fontana Police Department arrived at the scene of the crash.  Bernholtz saw that a vehicle had crashed into a house and also saw a man, later identified as Lucero, standing in the front yard of the house.  When Lucero saw the officer, he yelled, "Oh, fuck" and ran across the street to a parked black Honda.  Lucero got into the Honda and drove off rapidly, with Officer Bernholtz in pursuit.  Shortly thereafter, Lucero crashed the Honda.  Lucero got out of the Honda and began to run.  Lucero ran for about 15 feet and then surrendered as another police officer approached.

Authorities found Silveira in the driver's seat of the vehicle that had crashed into the house.  Silveira suffered a total of six gunshot wounds, all to his upper body and head.  Silveira died from the gunshots.

3.      *Lucero's police interview*

Approximately six hours after the killing, Fontana Police Detective Daniel Delgado interviewed Lucero.[3]  During the interview, Lucero admitted calling Officer

---

[3]      The People played a video recording of the interview for the jury.

Porch the night before the killing in order "to get [Silmi]." Lucero also acknowledged going to the scene of Officer Porch's traffic stop of Silmi and asking Silmi if Silmi wanted him to take possession of Silmi's Mercedes. According to Lucero, Silmi declined the offer, explaining to Lucero that he had "drop-offs" from his business.

Lucero told Detective Delgado that Silveira came and got Silmi's money. Lucero explained that later that evening, he went back to the barbershop and visited with Silveira for the remainder of the night. The following morning, at approximately 7:00 a.m., Silmi called Silveira and asked Silveira to pick him up from jail. Lucero asked Silveira to drive him to his van, which was parked around the corner from his home.

When they arrived at Lucero's van, Lucero sat in his seat for a few seconds. Silveira asked Lucero, " '[W]hat's up?' " Lucero then "turned on him," pulled out a .32 caliber handgun and told Silveira to " 'pop the trunk.' " Lucero started to get out of the car. Silveira screamed and began to drive off. Lucero fired several gunshots at Silveira.

Lucero watched the car Silveira was driving crash into a house. He then ran to his van and drove home. He wrapped the gun in a towel and placed it on the back part of the couch behind the house. Lucero stated that he then "figured, fuck I just killed him. And now I've got to get the money, you know?"

After changing shirts, Lucero drove back to the scene of the shooting in a Honda, parked around the corner, and removed the license plates from the Honda. Lucero then approached the vehicle Silveira was driving and saw that Silveira was dead. Lucero reached inside a window of the car, unlocked the door, put the car in park, and grabbed the keys. Lucero then removed bags of cash from the trunk of the car. At that point,

6

Lucero saw a police officer, and said, " '[O]h[,] fuck.' " Lucero dropped the bags of cash, ran to his Honda, and drove off. Shortly thereafter, he crashed the Honda and surrendered to police.

At one point in the interview, Lucero stated, "This was just fucking [the] answer to all of my problems so fast. You know? Money is a bitch, dude."

4. *Evidence of Lucero's use of methamphetamine prior to the killing*

During his interview with Detective Delgado, while discussing the killing, Lucero said, "It was a mistake. A horrible mistake. A drug induced mistake." Lucero stated that the night before the killing, he had been "smoking dope [methamphetamine] all night," and explained that he, together with Silveira and another person, had smoked a total of two grams of methamphetamine. Lucero also said that recently, he had been "smoking it all day."[4]

Near the end of the interview, Lucero read a statement to Detective Delgado that he had written after being taken into custody. In the statement, Lucero wrote that he had been "heavy on drugs." Lucero also stated, "Meth is the worst thing that ever happened to [ ]me. Today I felt out of body. I didn't have self conscious [*sic*] to stop. I couldn't. . . . The dope still has me in a daze." Lucero also stated, "I haven't slept more than [five] hours the last four days. . . . I lost control of myself between 7 pm and this morning."

---

4 Detective Delgado stated during the interview that Lucero's family had told Delgado that Lucero had been "wrapped up doing some dope for like about [two] weeks."

After Lucero read his statement, Detective Delgado asked Lucero whether he would like to see his wife. Lucero answered, "I can't . . . not like this." Detective Delgado responded, "Well you're still high," and told Lucero, "Couple of days, sober up . . . she's going to be able to visit you over there."

Detective Delgado testified Lucero appeared to be drowsy and fell asleep while in custody at the police station prior to the interview. Delgado also testified that he believed that Lucero was still "high" during the interview because he was "having problems speaking."[5] Detective Delgado said that Lucero had difficulty reading his own handwriting toward the end of the interview when Lucero read his statement to Delgado.

B.    *Procedural background*

A jury found Lucero guilty of murder (§ 187, subd. (a)) (count 1), robbery (§ 211) (count 2), unlawful possession of ammunition (§ 30305, subd. (a)(1)) (count 3), possession of a firearm by a felon (§ 29800, subd. (a)) (count 4), and assault with a firearm (§ 245, subd. (a)(2)) (count 5). In addition, with respect to counts 1, 2, and 5, the jury found that Lucero personally and intentionally discharged a firearm causing bodily injury or death within the meaning of section 12022.53, subdivision (d), personally and intentionally discharged a firearm within the meaning of section 12022.53, subdivision (c), and personally used a firearm within the meaning of section 12022.53, subdivision

---

[5]    The killing occurred at approximately 7:00 a.m. Lucero was taken into custody shortly after the killing, and Delgado interviewed Lucero from approximately 1:00 p.m. to 2:00 p.m. that same day.

(b).  The jury further found Lucero committed the murder during the course and commission of a robbery.

In a bifurcated proceeding, the trial court found that Lucero had suffered a prior strike conviction (§§ 1170.12, subd. (a)-(d), 667, subds. (b)-(i)) and a prior serious felony conviction (§ 667, subd. (a)(1)).

The trial court sentenced Lucero to a determinate sentence of 3 years and four months, and an indeterminate sentence of 105 years to life.

III.

DISCUSSION

A.    *Any error in failing to instruct on the lesser included offense of second degree murder was harmless and the trial court did not err in failing to instruct on the lesser included offenses of voluntary manslaughter and involuntary manslaughter*

Lucero claims that the trial court erred in failing to instruct the jury sua sponte on the lesser included offenses of second degree murder, voluntary manslaughter, and involuntary manslaughter to the charged offense of malice murder (count 1) (§ 187, subd. (a)), given the evidence of his voluntary intoxication presented at trial.

"We apply the independent or de novo standard of review to the failure by the trial court to instruct on an assertedly lesser included offense." (*People v. Cole* (2004) 33 Cal.4th 1158, 1218 (*Cole*).)  In considering whether the trial court had a sua sponte duty to instruct the jury on lesser included offenses, we construe the evidence in the light most favorable to appellant.  (*People v. Turk* (2008) 164 Cal.App.4th 1361, 1368, fn. 5 (*Turk*).)

9

1. *The accusatory pleading*

The operative accusatory pleading in this case alleged that Lucero "unlawfully, and with malice aforethought murder[ed] [Silveira] . . . ."

2. *The trial court's jury instructions*

The trial court instructed the jury with respect to the charge of murder (count 1) pursuant to a modified version of CALCRIM No. 540A in relevant part as follows:

> "The defendant is charged in Count 1 with murder, under a theory of felony murder.  [¶]  To prove that the defendant is guilty of first degree murder under this theory, the People must prove that:
>
> "1. The defendant committed or attempted to commit Second Degree Robbery;
>
> "2. The defendant intended to commit Second Degree Robbery;
>
> "AND
>
> "3. While committing or attempting to commit Second Degree Robbery the defendant caused the death of another person.
>
> "A person may be guilty of felony murder even if the killing was unintentional, accidental, or negligent.  [¶]  To decide whether the defendant committed or attempted to commit Second Degree Robbery, please refer to the separate instructions that I have given you on those crimes[.]  You must apply those instructions when you decide whether the People have proved first degree murder under a theory of felony murder."

The trial court did not instruct the jury on any other theories of murder, and did not instruct the jury on any other homicide offense.

10

The trial court instructed the jury with respect to voluntary intoxication pursuant to a modified version of CALCRIM No. 625 pertaining to the effect of voluntary intoxication on the homicide crime charged in this case[6] as follows:

> "You may consider evidence, if any, of the defendant's voluntary intoxication only in a limited way. You may consider that evidence only in deciding whether the defendant acted with the specific intent to take property by force or fear.[7]  [¶]  A person is *voluntarily intoxicated* if he or she becomes intoxicated by willingly using any intoxicating drug, drink, or other substance knowing that it could produce an intoxicating effect, or willingly assuming the risk of that effect.  [¶]  You may not consider evidence of voluntary intoxication for any other purpose."

The court also instructed the jury pursuant to a modified version of CALCRIM No. 3426 concerning voluntary intoxication. (See pt. III.B., *post*.) The modified version of CALCRIM No. 3426 also informed the jury that it could consider the evidence of Lucero's voluntary intoxication for the limited purpose of "deciding whether the defendant acted with the specific intent to take property by force or fear."

---

6    The instruction refers to an element of the crime of robbery, which the People were required to establish in order to prove felony murder premised on a killing occurring during a robbery.

7    A separate jury instruction informed the jury that in order to find Lucero guilty of second degree robbery (§ 211) (count 2), the jury was required to find that he took property that was not his own and that he "used force or fear to take the property," among other elements.

11

3.      *Governing law*

    a.      *Relevant homicide crimes*

      i.      *Murder*

Section 187 provides in relevant part, "(a) Murder is the unlawful killing of a human being . . . with malice aforethought."  Section 188 defines malice as follows: "Such malice may be express or implied.  It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature.  It is implied, when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart."  In further defining implied malice, the Supreme Court has stated, " 'Malice is implied when the killing is proximately caused by " 'an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.' " ' "  (*People v. Cravens* (2012) 53 Cal.4th 500, 507.)

Section 189 provides in relevant part, "All murder . . . which is committed in the perpetration of . . . robbery . . . is murder of the first degree."  Section 189 also provides that all types of murder, other than those specified in section 189, are murders of the second degree.

      ii.      *Manslaughter*

"Manslaughter is the unlawful killing of a human being without malice."  (§ 192.) Voluntary manslaughter occurs "when the defendant acts upon a sudden quarrel or heat of passion on sufficient provocation (§ 192, subd. (a)), or kills in the unreasonable, but

12

good faith, belief that deadly force is necessary in self-defense." (*People v. Manriquez* (2005) 37 Cal.4th 547, 583.) Involuntary manslaughter includes killings that occur "in the commission of an unlawful act, not amounting to a felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection." (§ 192, subd. (b).)

b.      *The determination of whether an uncharged offense is a lesser included offense*

Courts "have applied two tests in determining whether an uncharged offense is necessarily included within a charged offense: the 'elements' test and the 'accusatory pleading' test. Under the elements test, if the statutory elements of the greater offense include all of the statutory elements of the lesser offense, the latter is necessarily included in the former. Under the accusatory pleading test, if the facts actually alleged in the accusatory pleading include all of the elements of the lesser offense, the latter is necessarily included in the former." (*People v. Reed* (2006) 38 Cal.4th 1224, 1227-1228.)

c.      *The duty to instruct on lesser included offenses*

"A trial court must instruct the jury sua sponte on a lesser included offense only if there is substantial evidence, ' "that is, evidence that a reasonable jury could find persuasive" ' [citation], which, if accepted, ' "would absolve [the] defendant from guilt of the greater offense" [citation] *but not the lesser*.' " (*Cole*, *supra*, 33 Cal.4th at p. 1218.) In other words, "[s]uch instructions are required only where there is 'substantial evidence' from which a rational jury could conclude that the defendant committed the lesser

13

offense, and that he is not guilty of the greater offense."  (*People v. DePriest* (2007) 42

Cal.4th 1, 50.)

        d.     *The admissibility of evidence of voluntary intoxication in a criminal case*

Section 29.4 provides:

> "(a) No act committed by a person while in a state of voluntary intoxication is less criminal by reason of his or her having been in that condition.  Evidence of voluntary intoxication shall not be admitted to negate the capacity to form any mental states for the crimes charged, including, but not limited to, purpose, intent, knowledge, premeditation, deliberation, or malice aforethought, with which the accused committed the act.

> "(b) Evidence of voluntary intoxication is admissible solely on the issue of whether or not the defendant actually formed a required specific intent, or, when charged with murder, whether the defendant premeditated, deliberated, or harbored express malice aforethought.

> "(c) Voluntary intoxication includes the voluntary ingestion, injection, or taking by any other means of any intoxicating liquor, drug, or other substance."

Evidence of a defendant's voluntary intoxication is not "admissible to negate

*implied* malice."  (*Turk*, *supra*, 164 Cal.App.4th at p. 1375.)

    4.    *Application*

        a.     *Any error committed by the trial court in failing to instruct on the lesser included offense of second degree murder was harmless*

            i.     *We assume for purposes of this decision that the trial court erred in failing to instruct the jury on second degree murder*

We assume for purposes of this decision that second degree murder was a lesser

included offense to the charged offense of malice murder under the accusatory pleading

test because the charging document charged malice murder, and did not specify felony

murder. (*People v. Campbell* (2015) 233 Cal.App.4th 148, 159-160 (*Campbell*) [where accusatory pleading alleged malice murder, pleading "gave rise to possible lesser included offense[ ] of second degree murder"].)[8] We also assume, in light of the evidence in the record of Lucero's voluntary intoxication (see pt. II.A.4., *ante*), that the jury could have found that he did not act with the specific intent to take property by force or fear, and thus did not commit or attempt to commit second degree robbery. Lucero's commission or attempted commission of second degree robbery was an element of felony murder, the sole theory of murder presented to the jury. Thus, in light of the evidence of Lucero's voluntary intoxication, we further assume that the jury could have reasonably found that Lucero did not commit the greater offense of felony murder. However, in light of the overwhelming evidence that Lucero committed the killing and since evidence of Lucero's voluntary intoxication was inadmissible to negate implied malice, an element of second degree murder, we further assume that the jury could have reasonably found that Lucero was guilty of the lesser included offense of second degree murder. Accordingly, we assume for purposes of this decision that the trial court erred in failing to instruct the jury on second degree murder. (See *Cole*, *supra*, 33 Cal.4th at p. 1218 [trial court has duty to instruct on lesser included offense where there is substantial

---

[8]    We need not decide whether second degree murder is a lesser included offense of felony murder under the statutory elements test. (*People v. Banks* (2014) 59 Cal.4th 1113, 1160 [concluding that second degree murder was lesser included offense under accusatory pleading test and stating "[w]e . . . do not reach the question raised by the Attorney General of whether second degree murder is a lesser included offense of felony murder under the statutory elements test"].)

15

evidence that " ' "would absolve [the] defendant from guilt of the greater offense" [citation] *but not the lesser*' ".)

> ii. *The assumed error in failing to instruct the jury on second degree murder was harmless*

In *People v. Breverman* (1998) 19 Cal.4th 142, 149 (*Breverman*), the California Supreme Court held, "The sua sponte duty to instruct fully on all lesser included offenses suggested by the evidence arises from California law alone," and thus a trial court's error in fulfilling this duty "must . . . be evaluated under the generally applicable California test for harmless error . . . set forth in [*People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*)]." (*Id.* at p. 176.) Under *Watson*, reversal is not warranted unless "it appears 'reasonably probable' the defendant would have obtained a more favorable outcome had the error not occurred (*Watson*, *supra*, [at p.] 836.)" (*Breverman*, *supra*, at p. 178.)

Lucero argues that "in order to hold appellant responsible for the killing, the jury had no choice but to find appellant guilty of the robbery," because it was not instructed on any other homicide offenses. Lucero contends that the jury "likely felt compelled" to reach guilty verdicts on both the murder and robbery. In other words, Lucero suggests that the jury would have found him *not* guilty of robbery, and thus not guilty of first degree felony murder, if the jury had been given the option of finding him guilty of second degree murder. We are not persuaded.

To begin with, the jury found Lucero guilty of robbery, despite being instructed that it could consider evidence of his voluntary intoxication in determining whether he acted with the specific intent to take Silveira's property by force or fear. Even assuming

16

the jury's guilty verdict on the robbery charge does not establish harmlessness, the verdict is clearly relevant to our determination. (See *Campbell*, *supra*, 233 Cal.App.4th at p. 167 ["a jury's determination on a factual issue under other instructions is relevant to determining whether an instructional error is harmless[;] it does not categorically establish that the error was harmless" (italics omitted)].)[9]

Moreover, there was extremely strong evidence that Lucero acted with the specific intent to take property by force or fear, and very weak evidence that Lucero's voluntary intoxication prevented him from forming the specific intent to take Silveira's property by force or fear. With respect to the evidence supporting Lucero's specific intent to take property by force or fear, the People presented strong evidence that Lucero formulated a plan to obtain Silmi's money the night prior to the robbery/killing after overhearing that Silmi had deposits from his business in his car. Officer Porch testified that Lucero called him the night before the robbery/killing and reported that Silmi was carrying something illegal on his person. During Officer Porch's traffic stop of Lucero, Lucero arrived on

---

[9]    In *People v. Gonzalez* (March 30, 2016, B255375) ___ Cal.App.2d ___ [2016 Cal.App. Lexis 245, p. *41], the court concluded that "the jury's return of guilty verdicts on felony murder charges and true findings on the robbery special circumstance allegations *necessarily* resolved factual issues related to lesser included offenses of malice murder against appellants." (Italics added.) The *Gonzalez* court disagreed with *Campbell* to the extent that *Campbell* "suggests that the jury's guilty verdicts on felony murder and its true findings on a robbery special circumstance allegation do not render the failure to instruct on lesser included offenses of malice murder harmless . . . ." (*Gonzalez, supra*, at p. ___ [2016 Cal.App. Lexis at p. *43].) In this case, for the reasons stated in the text, any instructional error was harmless, even assuming the jury's guilty verdict on the robbery charge did not necessarily establish a lack of prejudice.

17

foot and offered to take Silmi's money. Lucero admitted during his confession to police that he called Officer Porch in order to "get [Silmi]."

Further, the People presented evidence that after being unable to obtain Silmi's money through this ruse, Lucero formed another plan to obtain the money. Lucero confessed that he formulated a plan to rob Silveira the following morning.[10] Lucero further confessed that, just before the killing, he pulled out a gun and told Silveira to " 'pop the trunk,' " further evincing his intent to rob Silveira of the money contained in the trunk of the car. In addition, Lucero admitted shooting Silveira, driving home, disposing of his weapon, changing shirts, changing cars, returning to the scene of the shooting, and removing license plates from the car he was driving before going back to the car Silveira was driving to take the money from the trunk of the car. Lucero also admitted that just after he took the money, he saw a police officer, yelled " 'oh fuck,' " and dropped bags of cash before attempting to flee. Lucero repeatedly admitted during his confession that he committed the killing in order to obtain Silmi's money, stating at one point, that "[his] head was obsessed on getting money."

Physical, eyewitness, and video evidence corroborated Lucero's confession. For example, police recovered the gun used in the robbery/killing at Lucero's residence in the location where Lucero had informed police that it would be found. Police also located the Honda's license plates that Lucero confessed to having removed after the shooting, inside the Honda. Just after the killing, Cardoso observed Lucero run to a van parked

_____

10    Lucero stated that the plan to rob Silveira "popped into [his] head," approximately half an hour before Silveira took Lucero back to his van.

nearby and drive away. The jury also viewed surveillance footage from a nearby house that showed portions of the incident occurring in a manner consistent with Lucero's confession.

In addition, while there was evidence that Lucero had used methamphetamine prior to the robbery/killing, there was very little evidence that Lucero was so intoxicated that he was unable to form the specific intent to take Silveira's property by force or fear. Among other evidence, Lucero's confession that he formulated the plan to rob Silveira prior to getting a ride back to the van, and that he executed that plan through a complicated series of events including shooting Silveira, driving home, changing his shirt, returning to the scene in a different car, removing the license plates from that car, and then taking money from the trunk of the car Silveira was driving, are all inconsistent with Lucero's claim that he was so intoxicated as to be unable to form the specific intent to take property by force or fear.[11] In light of this evidence, we conclude that there is not a reasonable probability that the jury would have found Lucero not guilty of robbery, and thus not guilty of first degree felony murder, if the court had instructed the jury on second degree murder.

---

[11] In addition, in his confession, Lucero provided numerous details of many of the actions that he undertook with respect to each aspect of the plan that were not consistent with him being so intoxicated as to be unable to form a specific intent. For example, in describing how he gained access to the car Silveira was driving after the shooting, Lucero explained that he reached inside a window of the car, unlocked the door, put the car in park, and grabbed the keys. Lucero explained, "I wanted to get in the trunk."

19

Accordingly, we conclude that any error committed by the trial court in failing to instruct on second degree murder was harmless.[12]

> **b.** *The trial court did not err in failing to instruct on the lesser included offenses of voluntary manslaughter and involuntary manslaughter*

We assume for purposes of this decision that voluntary manslaughter and involuntary manslaughter were lesser included offenses to the charged offense of murder under the accusatory pleading test. (See *Campbell*, *supra*, 233 Cal.App.4th at pp. 159-160) [where accusatory pleading alleged malice murder, voluntary manslaughter and involuntary manslaughter were lesser included offenses].)

As noted above, manslaughter, whether voluntary or involuntary, is "the unlawful killing of a human being *without* malice" (§ 192, italics added), and evidence of a defendant's voluntary intoxication is not "admissible to negate *implied* malice." (*Turk*, *supra*, 164 Cal.App.4th at p. 1375.) Aside from referring to his voluntary intoxication, which is not admissible to negate implied malice (*ibid.*), Lucero fails to identify any evidence from which the jury could have found that he did not act with implied malice in

---

[12]    Lucero also requests that this court reverse the "robbery conviction[ ]." Although Lucero does not present any separate argument as to why any error in failing to instruct the jury on second degree murder would necessitate reversal of the robbery conviction, he does contend that the jury felt "compelled" to convict him of robbery in order to find him guilty of first degree murder on a felony murder theory.

For the reasons discussed in the text, any error in failing to instruct the jury with respect to second degree murder was harmless because there is no reasonable probability that the jury would have found Lucero not guilty of robbery if the trial court had instructed the jury on second degree murder. Thus, there is no basis for reversing Lucero's robbery conviction based on the trial court's assumed error in failing to instruct on second degree murder.

20

committing the killing.[13]  Further, in light of the evidence discussed in part III.A.3.a.ii., *ante*, there was overwhelming evidence that Lucero acted with, at a minimum, *implied* malice.  Thus, there was no evidence from which the jury could reasonably have found that Lucero had *not* committed a murder, but *had* committed manslaughter.  Under these circumstances, the trial court did not err in failing to instruct the jury on either voluntary or involuntary manslaughter.  (See *Cole*, *supra*, 33 Cal.4th at p. 1218.)

B.      *The trial court properly instructed the jury that it could not consider Lucero's voluntary intoxication for purposes of determining the truth of the section 12022.53, subdivisions (c) and (d) firearm enhancement allegations*

Lucero claims that the trial court erred in instructing the jury that it could not consider his voluntary intoxication for purposes of determining the truth of the section 12022.53, subdivisions (c) and (d) firearm enhancement allegations attached to counts 1, 2, and 5.  Lucero contends that "the mental state required for a true finding on the gun allegation[s] is clearly one of specific intent," and thus, evidence of his voluntary intoxication was admissible in determining the truth of such allegations.  We review Lucero's claim de novo.  (See *People v. Guiuan* (1998) 18 Cal.4th 558, 569-570 [jury instruction claim that involves the determination of applicable legal principles is reviewed de novo].)

---

13      Lucero asserts, "[I]f the jury believed the evidence [of his voluntary intoxication] and rejected any express malice, and *found no implied malice*, the fact of intoxication could have reduced appellant's crime to involuntary manslaughter, had the jury been property instructed."  (Italics added.)  However, he identifies no evidence in the record, and we have found none, on which the jury could have found that Lucero committed an unlawful killing, but that in doing so, he did not harbor implied malice.

21

The trial court instructed the jury pursuant to a modified version of CALCRIM No. 3426 in relevant part as follows:

> "You may consider evidence, if any, of the defendant's voluntary intoxication only in a limited way. You may consider that evidence only in deciding whether the defendant acted with the specific intent to take property by force or fear. [¶] . . . [¶] You may not consider evidence of voluntary intoxication for any other purpose. Voluntary intoxication is not a defense to . . . any of the special allegations."[14]

Section 12022.53, subdivision (c) provides a sentence enhancement for any person who, in the commission of specified felonies, "personally and intentionally discharges a firearm . . . ." Section 12022.53, subdivision (d) provides a sentence enhancement for any person who, in the commission of certain specified felonies, "personally and intentionally discharges a firearm and proximately causes great bodily injury, as defined in Section 12022.7, or death, to any person other than an accomplice . . . ."

"[E]vidence of voluntary intoxication is *admissible* on the issue of whether or not a defendant actually formed a required specific intent . . . ." (*People v. Mathson* (2012) 210 Cal.App.4th 1297, 1312, italics added.) However, "[e]vidence of voluntary intoxication is *inadmissible* to negate the existence of general criminal intent." (*People v. Atkins* (2001) 25 Cal.4th 76, 81, italics added; see § 29.4, subd. (b) ["Evidence of

---

14     As noted in part III.A., *ante*, the trial court also instructed the jury concerning voluntary intoxication pursuant to a modified version of CALCRIM No. 625. In that instruction, the court also instructed the jury that it could consider evidence of Lucero's voluntary intoxication for the limited purpose of determining whether he "acted with the specific intent to take property by force or fear." The court also instructed the jury, "You may not consider evidence of voluntary intoxication for any other purpose."

In addition, the court instructed the jury that "the special allegations" required proof of "general criminal intent."

voluntary intoxication is admissible solely on the issue of whether or not the defendant actually formed a required specific intent . . . ."].)

" 'The distinction between specific and general intent crimes evolved as a judicial response to the problem of the intoxicated offender' and the availability of voluntary intoxication as a defense." (*People v. Hering* (1999) 20 Cal.4th 440, 445 (*Hering*).) "When the definition of a crime [or an enhancement] consists of only the description of a particular act, without reference to intent to do a further act or achieve a future consequence, we ask whether the defendant intended to do the proscribed act. This intention is deemed to be a general criminal intent. When the definition refers to defendant's intent to do some further act or achieve some additional consequence, the crime is deemed to be one of specific intent." (*People v. Hood* (1969) 1 Cal.3d 444, 456-457 (*Hood*).) In addition, "when the Legislature intends to require proof of a specific intent in connection with a sentence enhancement provision, it has done so explicitly by referring to the required intent in the statute. (See, e.g., former § 12022.7, subd. (a), as amended by Stats. 1994, ch. 873, § 3.)" (*In re Tameka C.* (2000) 22 Cal.4th 190, 198-199.)[15]

Section 12022.53, subdivisions (c) and (d) both provide for additional punishment for a defendant who "personally and intentionally discharges a firearm" under specified circumstances. Both subdivisions refer only to the description of a particular act—

---

[15] The statute cited by the Supreme Court in *In re Tameka C.* provided in relevant part, "Any person who, *with the intent to inflict the injury*, personally inflicts great bodily injury . . . shall . . . be punished . . . ." (Former § 12022.7, subd. (a), as amended by Stats. 1994, ch. 873, § 3, italics added.)

23

discharging a firearm—without reference to the defendant's intent to achieve any additional consequence. Further, neither subdivision includes "language typically denoting specific intent crimes, such as 'with the intent' or 'for the purpose of.' " (*Hering*, *supra*, 20 Cal.4th at p. 446.) For instance, neither subdivision states that the discharge of the firearm must be done *with the intent to inflict* injury. (Compare with section 12022.55 ["any person who, *with the intent to inflict great bodily injury or death*, inflicts great bodily injury, as defined in Section 12022.7, or causes the death of a person, other than an occupant of a motor vehicle, as a result of discharging a firearm from a motor vehicle in the commission of a felony or attempted felony, shall be punished," italics added].)

We are not persuaded by Lucero's argument that the statute's specification that the use of the word "intentionally" in section 12022.53, subdivisions (c) and (d) indicates that the statue specifies a *specific* rather than a *general* intent. "An intentional use of a firearm in the commission of a crime does not encompass any specific intent." (*People v. Wardell* (2008) 162 Cal.App.4th 1484, 1494 [rejecting argument that a section 12022.5, subdivision (a) firearm use enhancement "requires proof that the perpetrator *specifically intended* 'to facilitate the commission of the underlying crime' "].) In short, because section 12022.53, subdivisions (c) and (d) "consist[ ] of only the description of a particular act,"—i.e. discharging a firearm—"without reference to intent to do a further act or achieve a future consequence," the enhancements require only proof of the defendant's general intent. (*Hood*, *supra*, 1 Cal.3d at pp. 456-457.)

24

Accordingly, we conclude that the trial court properly instructed the jury that it was not to consider evidence of Lucero's voluntary intoxication in determining the truth of the section 12022.53, subdivisions (c) and (d) firearm enhancement allegations.

C.    *The abstract of judgment must be corrected*

The People note that the abstract of judgment incorrectly states that Lucero was sentenced to life without the possibility of parole.  As noted in part II.B., *ante*, the trial court sentenced Lucero to a determinate sentence of 3 years and four months, and an indeterminate sentence of 105 years to life.  The People request that we direct that the abstract of judgment be corrected.  We order the abstract of judgment corrected in accordance with the People's concession.

## IV.

## DISPOSITION

The judgment is affirmed.  The trial court is directed to correct the abstract of judgment in accordance with part III.C., *ante*, and to forward the corrected abstract of judgment to the Department of Corrections and Rehabilitation.


                                                            AARON, J.

WE CONCUR:

HUFFMAN, Acting P. J.

McDONALD, J.


25