Filed 4/9/26  P. v. Rubio CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E084574 |
| v. | (Super.Ct.No. FVI23000184) |
| LUIS ENRIGUE RUBIO, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Nicole Quintana Winter, Judge.  Affirmed.

Michael C. Sampson, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Daniel Rogers, Matthew C. Mulford and Alana Cohen Butler, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted defendant and appellant Luis Enrique Rubio of attempted murder (Pen. Code,[1] §§ 187, subd. (a), 664), finding it true it was deliberate and premeditated (§ 189, subd. (a)). The jury also found true that defendant personally inflicted great bodily injury under circumstances involving domestic violence (§ 12022.7, subd. (e)), and he personally used a dangerous and deadly weapon, to wit, a knife (§ 12022, subd. (b)(1)). Defendant's sole challenge on appeal is the trial court gave a legally erroneous jury instruction on voluntary intoxication that precluded jurors from considering voluntary intoxication evidence as it relates to premeditation and deliberation. We conclude the voluntary intoxication instruction was legally erroneous, but the error is harmless. Therefore, we affirm.

## I. PROCEDURAL BACKGROUND AND FACTS

In 2023, John Sharp was living in Victorville with Diane Goldberg, who was friends with the victim, T.L. T.L. lived with them "on and off." In January 2023, T.L. brought defendant to stay at the house.

On January 12, 2023, around 10:00 a.m., Sharp was in the living room watching TV, T.L. was in her bedroom, and defendant was back and forth between the bathroom, bedroom, and kitchen. At one point, defendant went to the kitchen briefly, then Sharp heard a woman screaming from T.L.'s room. Prior to the screams, Sharp did not hear any argument or commotion; he only heard the two "conversing." During T.L.'s screams, Sharp heard the word knife and sounds that she was being stabbed. He went to her

---

[1] Further statutory references are to the Penal Code unless otherwise stated.

2

bedroom door and saw defendant standing over her as she was curled up sitting in the corner. Sharp told defendant to get out; he was argumentative but left.

Sharp went to check on T.L. and saw a knife sticking out of her face. He described what he saw as "a massacre" or "something like that out of a horror movie." Sharp called 911. When police arrived, they found T.L. on the floor of her bedroom; her head was lying on top of a laundry hamper where there was a pool of blood. They observed blood splatter on the wall, "a butcher knife with a black handle impaled on the right side of [T.L.'s] head near the right eye," and a wine bottle in the trash can.

Sharp told officers that shortly before the stabbing he heard slamming in the kitchen. A search of the knife drawer in the kitchen revealed that it was in disarray. Sharp testified that the knives were generally placed neatly under a rubber mat. He did not create the disarray in the drawer and did not know who did. Sharp assumed defendant retrieved a knife from the drawer because those were the only knives in the house.

Shortly after the stabbing was reported, a deputy sheriff located defendant running on Burning Tree Road near a golf course. The golf course is "about 10-to-15 minutes by foot" from Sharp's house. Defendant was wearing only blue jeans and white shoes; he seemed tired and was sweating "like he had been running." When defendant saw the deputy get out of the patrol car, he ran into the golf course. The deputy identified himself, pursued defendant, and told him to stop. Eventually, he was apprehended; the deputy found a box cutter with an exposed blade in defendant's waistband. A search of the area around the golf course produced a T-shirt next to some bushes that are between

3

Sharp's house and the location where defendant was detained. Near the collar of the T-shirt were red stains, which appeared to be blood.

At the time of defendant's arrest, a sheriff deputy noted that he (defendant) was shirtless and had blood splatter toward the bottom of his shoes. There appeared to be blood drops on his left hand and scratches on his left chest and left rib cage. The deputy opined that the scratches could have been defensive wounds caused by the victim. Defendant also had a laceration on his right palm, consistent with a knife cut. The deputy did not check or test the blood for DNA and did not know its origin.

T.L. received sutures for a cut above her eye, a cut to her nose, and a cut to the right side of her face. She also had bruising to her nose and eye, and her injuries required surgery.

On January 29, 2023, defendant called T.L. from jail. During the call, he apologized for hurting her and said that he was not himself that night because he was hearing voices telling him to hurt her. He stated he just "flipped out" and "snapped" and did not recall what happened. Defendant told T.L. that before he stabbed her, he was "tripping" and promised her "no more drugs. No more alcohol, no. None of that shit." He said he wanted "to learn from" this incident. T.L. repeatedly forgave him and told him she loved him. Before the call ended, he told her that his preliminary hearing is coming up and they will ask her if he was hearing voices. He told her to be honest with them about him hearing voices and tripping. After repeatedly telling her he loved her, defendant said, "It was just, you know, we were arguing. It was just a mess, you know?"

4

On May 16, 2024, defendant was charged with premeditated and deliberate attempted murder (§§ 664, 187, subd. (a), count 1); assault with intent to commit a felony (§ 220, subd. (a)(1), count 2); and assault with a deadly weapon (§ 245, subd. (a)(1), count 3).  The People dismissed counts 2 and 3 before the jury retired for deliberations.  It was further alleged that defendant committed the attempted murder with a deadly weapon (§ 12022, subd. (b)(1)). and personally inflicted great bodily injury (§ 12022.7, subd. (e)).  The jury found defendant guilty of premeditated and deliberate attempted murder, and found true the deadly weapon and personal infliction of great bodily injury enhancements.  The trial court sentenced him to five years plus seven years to life in state prison.

## II.  DISCUSSION

Defendant contends the trial court's instruction on voluntary intoxication was legally erroneous because it expressly, and improperly, precluded the jury from considering evidence of his intoxication when deciding premeditation and deliberation.  The People argue the evidence of intoxication was so weak that no instruction was warranted; furthermore, any error in precluding premeditation and deliberation in its voluntary intoxication instruction was harmless.  We agree the court erred by precluding premeditation and deliberation in its voluntary intoxication instructions, but conclude the error is harmless.

### A.  Relevant Background Facts

At trial, it was noted that a wine bottle was located in the trash can in T.L.'s bedroom; however, no evidence was introduced as to when and who consumed the wine.

5

During his phone call with T.L., defendant apologized for hurting her, claiming he was not himself because he was hearing voices tell him to hurt her; he stated he wanted to learn from this incident and promised her no more drugs or alcohol. No evidence was introduced to show that defendant was under the influence of any substance at the time of the incident, nor did the defense offer any expert testimony that defendant's behavior was in line with someone who was under the influence of drugs or alcohol. Moreover, neither Sharp, T.L., nor any member of law enforcement observed defendant talking to himself.

Over the prosecution's objection, the trial court found sufficient evidence to allow the defense to argue voluntary intoxication to negate specific intent. Accordingly, the jury was given CALCRIM No. 3426: "You may consider evidence, if any, of the defendant's voluntary intoxication only in a limited way. You may consider that evidence only in deciding whether the defendant acted with the intent to kill [T.L.] [¶] A person is *voluntarily* intoxicated if he or she becomes intoxicated by willingly using any intoxicating drug, drink, or other substance knowing that it could produce an intoxicating effect, or willingly assuming the risk of that effect. [¶] In connection with the charge of Attempted Murder, the People have the burden of proving beyond a reasonable doubt that the defendant acted with a specific intent to kill. If the People have not met this burden, you must find the defendant not guilty of Attempted Murder." The court did not instruct the jurors that they could also consider defendant's intoxication when determining whether he acted with the heightened mental state of premeditation and deliberation.

During closing argument, the prosecutor acknowledged that intoxication may negate the specific intent for attempted murder, but argued the evidence was insufficient

6

to show that defendant was intoxicated.  Specifically, she noted the only evidence was a wine bottle in the trash can, defendant's statement to T.L. that he would stay away from drugs and alcohol, and his claim that he was hearing voices.  She pointed out that there was no evidence defendant had been under the influence of alcohol or drugs at the time of his attack on T.L., no evidence of anyone observing him hearing voices, and no expert testimony to correlate his behavior with intoxication.

Defense counsel argued the prosecution must "prove beyond a reasonable doubt that intoxication played no part in" defendant's attack.  In contrast, he claimed defendant's voluntary intoxication affected premeditation and deliberation.  Counsel noted that during a jail call to T.L., defendant said he would not do drugs or alcohol anymore; in response, T.L. stated that she did not know what she had done.  According to counsel, these statements show defendant acted suddenly when he attacked T.L. such that his attack failed to rise to the level of willful or deliberate.[2]  Referencing CALCRIM No. 3426, counsel further asserted the phone call conversation demonstrates that drugs or alcohol played a role in defendant's actions.[3]  Regarding the allegation whether he

---

[2]  "All of a sudden, all of a sudden, right, nothing in all of a sudden rises to the level of willful, deliberate, where you went reflected on the consequences of your actions, what you're trying to do, right. . . . [¶]  Now, when we talk about willful, deliberate, and premeditated, that's not just a whim.· That's not just in the moment.· I was thinking, I was feeling it, that takes time.· That takes calculation.· And in that moment, even in the call, [T.L.] mentioned, I don't know what happened all of a sudden.· I thought everything was okay."

[3]  "And I will show you Jury Instruction No. 3426.  All right, which says that the defendant acted with the intent to kill.· However, a person is voluntarily intoxicated or other substance.· All right.· So when you listen to the call, . . . you'll hear [T.L.] agree,

*[footnote continued on next page]*

7

deliberately and with premeditation attempted to murder T.L., defense counsel reasoned that to conclude there was deliberate premeditation, the jurors had to conclude "the voices didn't matter.  [Defendant] wasn't on drugs.  That's all a ruse, right.  He had planned this all along, right."**4**

---

not as a yes, right, suggesting the way that the People are saying he's trying to convince her.  That's far from it.· Everything happened pretty quick.  He was talking to the TV.· He was hearing voices.· And when he said, yeah, we're going to do the cleansing, she agreed, yeah, that's what we're going to do.·. . . [¶]  So, it's my position, and I believe that whatever was happening in that bedroom, whatever drugs, alcohol, whatever else might also be there, played a role.· And for that, while it may be unreasonable to us, in that moment he was absolutely afraid, right."

**4** "So now going to that willful, deliberate, premeditation.· This is going to be that first allegation.· So let's just say you believe that the District Attorney has proved beyond a reasonable doubt that the fact [defendant] did intend to kill her.· That this is an extra step.  You can find [defendant] guilty of Count 1 and still find not true of the first allegation, which is, was it done willfully, with deliberation, with premeditation.

"If you find that he intended to kill, did he weigh the consideration for and against his choices, knowing the consequences, decided to kill, acting with premeditation.· All right.· That's more than just something that—that's more than just the moment.· It was the hearing of the voices.· Don't know what came over him.

"So this is what the People have to do.· The District Attorney has to get to beyond a reasonable doubt in every single one of those circumstances.· That leaves you with the only possible reasonable explanation for what happened.· And the only possible reasonable explanation of what happened is that the voices didn't matter.· He wasn't on drugs.· That's all a ruse, right.  He had planned this all along, right.· Because Mr. Sharp had explained, I think, that he had mentioned that [T.L.] had either invited him over, or they're at the house for maybe a couple of days they were hanging out.  But what the People are suggesting is that he planned this from the very get go.· He knew what he was going to do.

"Now, I understand one of the things that this says is that you look at the reflection of time.· So time isn't necessarily a factor, but the reflection is.· And I don't believe that there's enough evidence here to support that there was enough reflection to the point that it's beyond a reasonable doubt, to the point that it leaves you with no other reasonable possible other option.·

"So if you guys go back there, and you have your discussions, and you realize it is possible that he intended to kill her, that was done with premeditation, deliberation.·

*[footnote continued on next page]*

In response, the prosecutor argued the evidence was insufficient to show defendant had consumed any drugs or alcohol, but even if the jurors believed he had, he knew what he had done as evidenced by the fact that he apologized to T.L. and told her she had done nothing wrong (which shows he was not so intoxicated that he did not know what was going on, nor was he defending his family due to some delusion she was attacking him). Regarding premeditation, counsel maintained there "is no time requirement. Things can happen all of a sudden.· Even premeditation can happen all of a sudden.·. . . There's no evidence of the exact moment he decided to kill [T.L.].· There's evidence that he did form that intent before he started stabbing her because what else did he intend to do?"

*B. Standard of Review and Applicable Law*

Attempted murder is punishable by five, seven, or nine years in state prison. But if the trier of fact finds the attempted murder was "willful, deliberate, and premeditated," the punishment is "imprisonment in the state prison for life with the possibility of parole." (§ 664, subd. (a).)

There is no sua sponte duty to instruct on the effect of voluntary intoxication on the mental states required for attempted murder. (§ 28, subd. (b); *People v. Saille* (1991) 54 Cal.3d 1103, 1119-1120 (*Saille*); *People v. Castillo* (1997) 16 Cal.4th 1009, 1016 (*Castillo*) [includes attempted murder].) Rather, voluntary intoxication is more like a

---

Sure.· You have to come back with guilty. But at the same time, if you come back with saying, you know what, I think he, I think he was there, he attacked her, he apologized, but I do believe he was under the influence of drugs, alcohol, or both*,* or that, yeah, he does feel bad, he is sorry, he was hearing voices.· He did believe, and it may not be our reasonable belief, right, his reasonable belief, . . ."

9

"pinpoint" instruction to which a defendant is entitled upon request. (*Saille*, at p. 1119 ["They are required to be given upon request when there is evidence supportive of the theory, but they are not required to be given sua sponte"]; *People v. Ricardi* (1992) 9 Cal.App.4th 1427, 1432 [no sua sponte duty to instruct on voluntary intoxication but must give this instruction on request]; *Castillo*, at p. 1014.) Evidence of voluntary intoxication is "'admissible solely on the issue of whether or not the defendant actually formed a required specific intent, premeditated, deliberated, or harbored malice aforethought, when a specific intent crime is charged.'" (*Castillo*, at p. 1013; see *Saille*, *supra*, at pp. 1111-1112; § 29.4, subd. (b) [jury may consider evidence of voluntary intoxication and its effect on the defendant's required mental state].)

"A trial court must instruct the jury, even without a request, on all general principles of law that are "'closely and openly connected to the facts and that are necessary for the jury's understanding of the case.'"" (*People v. Burney* (2009) 47 Cal.4th 203, 246.) "Even if the court has no sua sponte duty to instruct on a particular legal point, when it does choose to instruct, it must do so correctly." (*Castillo*, *supra*, 16 Cal.4th at p. 1015.) We review instructional error arguments de novo. (*People v. Lucero* (2016) 246 Cal.App.4th 750, 758; *People v. Waidla* (2000) 22 Cal.4th 690, 733 ["Whether or not to give any particular instruction in any particular case entails the resolution of a mixed question of law and fact that, we believe, is however predominantly legal. As such, it should be examined without deference."].)

10

*C. Analysis*

Here, the trial court gave CALCRIM No. 3426, which told the jury they may consider evidence of defendant's voluntary intoxication "*only in a limited way. You may consider that evidence only in deciding whether the defendant acted with the intent to kill* [T.L.]." This instruction did not relate voluntary intoxication to mental state or premeditation and deliberation. Accordingly, defendant contends the instruction was erroneous because it unlawfully precluded the jury from considering the intoxication evidence in deciding whether he acted with premeditation and deliberation. (*People v. Mendoza* (1998) 18 Cal.4th 1114, 1134 (*Mendoza*); *Castillo*, *supra*, 16 Cal.4th at pp. 1014, 1016.) We agree.

In *Castillo*, there was evidence of defendant's voluntary intoxication prior to the murder. The trial court instructed the jury on voluntary intoxication according to CALJIC No. 4.21, which provided: "'In the crimes of murder and attempted murder . . . a necessary element is the existence in the mind of the perpetrator of the specific intent to kill. [¶] *If the evidence shows that the defendant was intoxicated* at the time of the alleged crime, *you should consider that fact in determining* whether the defendant had such *specific intent or mental state. . . .*'" (*Castillo*, *supra*, 16 Cal.4th at p. 1014, fn. 2, italics added.) Jurors also received CALJIC No. 4.21.1 that stated "'*where a specific intent or mental state is an essential element of the crime*'" "'*you should consider the defendant's voluntary intoxication in your determination of whether the defendant possessed the required specific intent or mental state* at the time of the commission of the alleged crime. [¶] Thus in the crimes of murder and attempted murder . . . a necessary

11

element is the existence in the mind of the defendant of a certain specific intent or mental state which is included in the definition of the crimes set forth elsewhere in these instructions.'" (*Ibid.*, italics added.) The defendant was convicted of first degree murder, where the sole theory was premeditation and deliberation. (*Id*. at pp. 1012-1013.)

On appeal, the defendant faulted trial counsel "for failing to request a 'pinpoint' jury instruction specifically relating voluntary intoxication to premeditation and deliberation." (*Castillo*, *supra*, 16 Cal.4th at p. 1012.) The appellate court agreed, but our Supreme Court did not. (*Id*. at p. 1016.) After considering the instructions as a whole, the court noted that even though the trial court did not include "mental state" when it told the jury what voluntary intoxication could be considered for, it did relate voluntary intoxication to "'specific intent or mental state'" elsewhere in the instructions. (*Ibid*.) Thus, the court found that no reasonable juror would have understood them to permit consideration of "intoxication in determining whether defendant specifically intended to kill but to prohibit [consideration of] that same intoxication in determining whether [the defendant] premeditated and deliberated. Premeditation and deliberation are clearly mental states; no reasonable juror would assume otherwise." (*Id*. at p. 1017; see *People v. Hughes* (2002) 27 Cal.4th 287, 342 ["'by relating intoxication to "mental state," a reasonable jury would have understood deliberation and premeditation to be "mental states" for which it should consider the evidence of intoxication'"].)

Defendant correctly notes that the same may not be said here because even when considering the instructions as a whole, the trial court failed to expressly instruct that the jury could consider intoxication "'where a specific intent *or mental state* is an essential

12

element of the crime.'" (*Castillo*, *supra*, 16 Cal.4th at p. 1017 ["Premeditation and deliberation are clearly mental states"].)  Voluntary intoxication was only linked to specific intent; the jury was not directed to also consider voluntary intoxication in regard to mental states.  In fact, they were instructed that they may "*only*" consider intoxication in deciding whether the defendant acted with the intent to kill.  By so instructing the jury, the court effectively precluded them from being able to consider evidence of voluntary intoxication for premeditation and deliberation.  Thus, we cannot conclude that "[n]o reasonable juror would understand the instructions to permit the jury to consider intoxication in determining whether defendant specifically intended to kill but to prohibit it from considering that same intoxication in determining whether he premeditated and deliberated." (*Ibid*.)

Having concluded the trial court erred in instructing the jury regarding voluntary intoxication, we must determine whether it was reasonably probable that the error affected the verdict adversely to defendant, per *People v. Watson* (1956) 46 Cal.2d 818, 836-837.  (See, e.g., *People v. Mendoza*, *supra*, 18 Cal.4th at pp. 1134-1135 [error in voluntary intoxication instruction subject to state law standard of review].)  We conclude that it did not.

The jury was properly instructed on voluntary intoxication as it related to defendant's ability to form the specific intent to kill.  By finding him guilty of attempted murder, the jury necessarily rejected any theory that his intoxication prevented him from forming the specific intent to kill.  We also agree with the People that the evidence of intoxication was scant.  A defendant is entitled to a jury instruction on voluntary

13

intoxication only when there is substantial evidence both that the defendant was voluntarily intoxicated and that his intoxication "affected [his] 'actual formation of specific intent.'" (*People v. Williams* (1997) 16 Cal.4th 635, 677 (*Williams*); see *People v. Verdugo* (2010) 50 Cal.4th 263, 295.)

There is no evidence defendant ingested any controlled substances prior to attacking T.L., nor did he appear to be under the influence at the time of his arrest. Although an empty wine bottle was found in the trash can in T.L.'s bedroom, no one testified that it was defendant who had consumed the wine, how much he had consumed, or when he had consumed it. Regarding defendant's jail call to T.L., he claimed to have heard voices telling him to hurt T.L.; however, he never attributed the voices to his intoxication. He only mentioned drugs and alcohol when he told T.L. that he wanted to stop using them and learn from this experience. Still, he never attributed his attack to being intoxicated. Rather, during his apology to T.L, he said, "It was just, you know, we were arguing. It was just a mess, you know?"

Nonetheless, assuming the above amounts to substantial evidence of defendant's voluntary intoxication, there is still no evidence it had any effect on his mental state. (See *Williams*, *supra*, 16 Cal.4th at pp. 677-678 [no instruction for voluntary intoxication required where evidence of intoxication was scant]; *People v. Marshall* (1996) 13 Cal.4th 799, 848 [evidence did not require requested voluntary intoxication instruction where the record did not support conclusion that at time of offense defendant was unable to premeditate or form intent to kill].) Evidence of defendant's acknowledgement that he was arguing with T.L., coupled with his decision to go to the kitchen, open the knife

14

drawer, lift the mat that covered the knives, select a butcher knife, return to the bedroom, and then repeatedly stab her, demonstrates he had the mental state to premeditate and deliberate his actions. Therefore, on this record, we conclude the erroneous instruction that precluded the jury from considering evidence of defendant's intoxication when deciding premeditation and deliberation was harmless. (See *People v. Watson*, *supra*, 46 Cal.2d at p. 837 [reasonably probable that a result more favorable would have been reached absent the error].)

## III. DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER
_____
                          J.

We concur:


RAMIREZ
_____
                  P. J.


FIELDS
_____
                  J.